IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 24, 2001 Session

## STATE OF TENNESSEE v. DANIEL WADE WILSON

**Appeal from the Criminal Court for Sullivan County**
**No. S42,735    Phyllis H. Miller, Judge**

---

**No. E2000-01885-CCA-R3-CD**
**August 2, 2001**

---

The Defendant, Daniel Wade Wilson, appeals as of right his convictions for second degree murder, first degree felony murder and especially aggravated robbery in the Sullivan County Criminal Court. The trial court merged the second degree murder conviction into the felony murder conviction, and the jury sentenced the Defendant to life imprisonment for the felony murder. The trial court sentenced the Defendant to twenty-three (23) years for the especially aggravated robbery conviction. The sentences were ordered to run consecutively. The Defendant raises the following four issues in this appeal: 1) whether the trial court erred in failing to charge all applicable lesser-included offenses; 2) whether the trial court erred in failing to instruct the jury on the natural and probable consequences rule; 3) whether the evidence was sufficient to sustain Defendant's convictions for first degree felony murder and especially aggravated robbery; and 4) whether the trial court erred in sentencing the Defendant. The judgment of the trial court is hereby affirmed in part and reversed in part, and remanded to the trial court for a new trial on the felony murder charge in Count II and the especially aggravated robbery charge in Count III of the indictment. The case is further remanded for sentencing on the second degree murder conviction in Count I of the indictment.

**Tenn. R. App. P. 3 Appeal As Of Right; Judgment of the Criminal Court Affirmed in Part and Reversed in Part; Remanded For New Trial and Re-Sentencing**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J. and JERRY L. SMITH, J., joined.

Stephen M. Wallace, District Public Defender; William A. Kennedy, Assistant Public Defender, for the appellant, Daniel Wade Wilson.

Paul G. Summers, Attorney General & Reporter; Patricia C. Kussmann, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; Joseph E. Perrin, Assistant District Attorney; Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

On the evening of April 4, 1999, Defendant, Brandon Alford, and Jared Christein were driven to a mountainous and wooded area called Big Creek, in Bristol, Tennessee by Susan Lingerfelt. While in Big Creek, the three men shared two twelve-packs of bottled Natural Ice beer. The three gathered some firewood, started a fire and sat around drinking beer and smoking marijuana. The Defendant, who had a knife, used it to kill frogs and cook them for food over the fire. The men stayed at Big Creek until approximately 1:30 a.m., as Susan Lingerfelt had not returned to take them home. After some time, a white Toyota Celica drove up to the area where they were sitting. Inside the car was Kim Bolling and the victim, David Vestal. Brandon Alford knew Ms. Bolling from high school, and asked her to give them a ride. Ms. Bolling responded that she was low on gas. The Defendant agreed to purchase gas for Bolling and the victim, if they would give the men a ride down the mountain. Bolling agreed.

The Defendant, Alford and Christein rode in the back of the car, while the victim drove and Bolling sat in the front passenger seat. The victim, who was highly intoxicated, drove very "crazy and wild." Everyone became upset with the victim's driving and warned him to slow down or they would "kick his butt." At some point, the car became stuck on a bridge as they were driving down the mountain, and Alford, the Defendant and Christein had to push the car back on to the road. The victim continued to drive until they reached the end of the gravel road in the mountains, when Bolling took over the driving. Brandon Alford testified that, during the drive down, he overheard the Defendant and Christein talking about "kicking the victim's butt" and taking his wallet.

At some point, Bolling stopped at a convenience store in Bristol to buy some gas. The victim went in to purchase the gas, but forgot the gas and bought cigarettes, oil and a six pack of bottled Busch beer instead. Alford testified that, while the victim was in the store, the Defendant asked Bolling to leave the victim, but she refused. Alford also heard Christein tell the Defendant that he wanted to go down to Steele's Creek Park to retrieve some marijuana Christein said he had hidden in the woods. Alford told the jury that he knew that Christein's story about the marijuana was not true, since he had been with Christein for two days, and had not heard Christein mention the marijuana. When the victim returned to the car, they left and Alford was taken home to Broad Street Trailer Park. Alford testified that it was approximately 2:30 a.m. when he arrived home.

The victim then took the Defendant and Christein to Steele's Creek Park to retrieve the marijuana Christein had discussed. In a statement provided to Detective Smeltzer of the Bristol Police Department, the Defendant described the subsequent events as follows:

> We went to Steele's Creek Park and the girl parked and the three of us guys walked down the paved path and down into the park. We crossed the bridge and started walking on the gravel path. The guy kept questioning Jared as to where the dope was and he kept telling the guy it was just around the next bend. At one point

2

the guy figured that there was no dope and got crazy toward us. He was yelling at us and he started swinging at me. I tried to fight him off and even tried to run away from him. He ran up after me and caught me by the neck of my shirt. We fought for a few seconds and I could not get the guy off me. Jared just stood there and wouldn't help get the guy off me. The scratches on my left hand and wrist are from him. He scratched me while we were fighting. When I couldn't get him off of me, I pulled my knife out and started jabbing at him. I don't know how many times I cut the guy. When the guy let go of me, I quit stabbing at him. The guy just sort of stood ---- just sort of stood there for a few seconds. I saw a dark spot on his shirt and then the guy just fell down. Jared then walked over to him and turned him over and took the guy's wallet. He then took his foot and kicked the guy over the embankment into the water. I knew about the robbery plan but really was only interested in getting some of the dope. I never took any of the money that Jared got out of the wallet. After this, we ran out of the park. We went past where the girl was parked and back up to the trailer park. Jared kept the wallet with him. When we got there, we went to the trailer that Brandon was staying at [sic]. Jared pulled out the wallet. He took out the currency and then started tearing the wallet up. We, Jared and me, walked out behind the trailer to the deck and Jared tried to set the wallet on fire. It would not burn, so he just tossed it in the creek bed. I went over and covered it up with rock. I then went on up to the house and just sat around. My wife kept asking me what was wrong. I just told her I felt sick. I finally went to sleep and then woke up around nine o'clock (9:00 a.m.). I just sat around the trailer. I was scared and figured the police would arrive any minute to get me. Around noon, I went on to work. I know that trying to take the man's money and stabbing him was wrong. I never got any of the money from Jared. I know that after I hurt the man I should have reported it to the police. I was just afraid for what we had done.

Rocky Smith testified that, on the morning of April 5, 1999, he was jogging in Steele's Creek Park when he "noticed what appeared to be blood, red, round circle" on the gravel trail. He looked around to see if "something might have been hurt like maybe a dog or duck." As Smith turned to look over the edge of the bank, he saw the body of a man. Smith testified that the man's body was lying on its back in the water, near the edge of the bank.

After discovering the body, Smith ran to get the help of Lieutenant Jack Necessary, who Smith had seen running ahead of him that morning. Upon reaching Lieutenant Necessary, Smith told the detective that he had found a body and the two ran back to where Smith had seen the body. Smith identified a photo of the body he found and verified that the photo correctly showed the position in which he found the body. Smith also testified that he never moved or touched the body.

Detective Charles Thomas of the Bristol, Tennessee Police Department testified that Lieutenant Necessary called and requested that he respond to the crime scene at Steele's Creek Park. Thomas was accompanied by Detective Jim Brewer. Upon arriving at Steele's Creek, Thomas took still photographs of the body and the blood that was located on the trail. Thomas told the jury that

3

the trail of blood went "from the body up a slight embankment between the lake and the trail, and then once it reached the trail, for approximately two hundred and seventy-five (275) feet back in the direction of Rooster Front Park." Detective Thomas testified that as he followed the trail of blood, he noticed "scuff marks" and signs that a struggle had taken place at different points along the trail. Thomas noticed that the trail of blood followed a pattern of becoming "fainter and darker," and finally became more continuous as he reached the pool of blood that was on the trail near the body. In the area where the victim's body was located, Thomas observed a "very large pool of blood that was . . . probably eight (8) to ten (10) inches wide and little over a foot long." Thomas stated that he also found a twelve ounce bottle of Busch beer, an empty Busch beer bottle that had blood on it, and a cigarette butt. On cross-examination, Thomas testified that he could not say whether the scuffle mark areas were related to the blood trails or to the events surrounding the victim's death. He further testified that the victim was drunk and his blood alcohol level was high.

Brandon Alford testified that, after he was taken home, he went straight to bed and he never saw the victim or Bolling again. Later, Christein arrived at Alford's trailer. Alford stated that he opened the door for Christein and went straight back to bed without talking to Christein. When Alford awoke later that morning, he saw Christein take $30 out of his sock. Alford testified that Christein had not had any money the night before and had not contributed any money to purchase the beer the men had been drinking. Alford also stated that he had not seen Christein with a wallet.

The next day, Alford was contacted by Detective Smeltzer, who came and took Alford to the police station. After arriving at the station, Alford was made aware of the victim's death. Alford gave Detective Smeltzer a detailed statement of what had transpired earlier that day and the night before. He further stated that while he was with the Defendant, the Defendant was wearing "a tie-dyed shirt. . .with a skull, a pair of blue jeans and pair of boots." Alford also identified photos of Defendant's clothes. He also testified that he went with Detective Debbie McCaulie to show her the places where he, the Defendant and Christein had been the night before.

On cross-examination, Alford testified that, on the day these offenses occurred, he and the Defendant borrowed his girlfriend's car and went to purchase some marijuana and some beer. The Defendant furnished the money for the beer and marijuana. Alford further testified that, during the drive down the mountain from Big Creek, the victim was driving "very reckless." He told the jury that he and the other men made statements that they would "whip [the victim's] ass if he hurt them." Alford stated that the Defendant and Christein continued to drink as they rode down the mountain, but he stopped drinking and only smoked the marijuana. Alford testified that he did not recall the Defendant giving the victim money for gas, nor did he recall Christein offering Ms. Bolling money to take the Defendant and Christein to Steele's Creek Park. He did recall Christein offering the victim and Ms. Bolling marijuana in exchange for a ride to Steele's Creek. Alford also testified that Christein "acted like he liked [Ms. Bolling]," because he asked her to leave the victim at the gas station. He further testified that, as he was getting out of the car to go home, he was intoxicated and staggering. Alford stated that the victim was under the influence and should not have been driving. He noted that the only times the Defendant had his knife out were to skin the frogs they ate and while they were in the car with Bolling and the victim. He also testified that, although he heard the

4

Defendant and Christein whispering about beating the victim and taking his wallet, he did not take their statements seriously. Alford stated that he thought the Defendant and Christein were just engaging in "drunk talk."

Lieutenant Jack Necessary testified that, on the morning of April 5, 1999, he was jogging in Steele's Creek Park. During his run, Lieutenant Necessary noticed that the gravel on the road was "flattened out or smooth where apparently a vehicle had been . . . traveling prior to [his] arrival." He also noticed some beer bottles fifty or sixty yards away from the trail. Necessary further testified that, after he had completed his run, he heard Rocky Smith yelling his name and summoning him to follow him to the creek, where Necessary saw a body laying by the creek. Necessary checked the victim for a pulse and determined that the victim was dead. Lieutenant Necessary contacted the Bristol Detective Division and spoke with Detective Thomas, and also requested that a list of other people be contacted and sent to assist. While waiting for the other detectives to arrive, Necessary took a crime kit from his car and began to secure the crime scene with yellow police tape. Necessary also inspected the trail surrounding the scene and observed that the gravel had been disturbed, indicating some type of struggle. Lieutenant Necessary also noticed blood, which led back to the area where the body was located. After Detective Thomas arrived, Necessary turned the processing of the crime scene over to Thomas and designated Thomas lead detective.

Later, that afternoon, Lieutenant Necessary went to the victim's home and advised family members about the victim's death. While there, he received a call advising him to contact the Defendant. Lieutenant Necessary found the Defendant working for a company called Peerless Woodworking. He asked the Defendant to come with him to the police station for questioning about the offense that occurred at Steele Creek Park. Necessary testified that upon mentioning his purpose to the Defendant, he noticed that the Defendant began "to shudder, he shook, and he began to squeeze his right fist, and it began to shake. Necessary stated that he explained to the Defendant that he was not under arrest, and the Defendant agreed to accompany him to the detective's bureau. Lieutenant Necessary further testified that the Defendant was wearing on his side, a leather sheath with a lock blade knife inside, which was taken from the Defendant before he entered the police cruiser.

Upon arriving at the bureau, Necessary advised the Defendant of his Miranda rights (which the Defendant waived) and then talked with the Defendant, along with Agent McCaulie of the Tennessee Bureau of Investigation. Lieutenant Necessary asked the Defendant about the party that he, Alford and Christein had engaged in during the previous night. The Defendant told Necessary and McCaulie that "someone by the name of Susan had taken them to that particular party and was supposed to come back within an hour to pick him up and subsequent to that he left with the victim and his girlfriend." The Defendant said that "they drove back to town by way of East High School and to the BP station and [he] was later dropped off at a trailer ---- Broad Street Trailer Park in Bristol, Tennessee." Lieutenant Necessary asked the Defendant if he had been at Steele's Creek Park, and the Defendant denied being at the park. Defendant insisted that the victim's girlfriend, Ms. Bolling, had dropped he, Alford and Christein at the trailer park and that he immediately went to bed.

5

Lieutenant Necessary testified that, during his interview with the Defendant, he observed scratch marks on Defendant's left hand. The Defendant told Necessary that he sustained the injuries at his job with Peerless Woodworking. Necessary also questioned the Defendant about the clothing he was wearing the night before. The Defendant responded that he still had on the clothes from the night before and that he had worn the same clothes to work. At this point, Necessary left the interview with the Defendant and Detective Smeltzer entered the room. Necessary went to the trailer park where the Defendant had been staying with his girlfriend, Angie Finley. He asked Ms. Finley about the clothes the Defendant had worn the night before, and she responded that the clothes were lying at the foot of their bed. Ms. Finley further stated that she had not had time to wash the Defendant's clothes. Lieutenant Necessary went into the bedroom to examine the clothes. He found a tie-dyed shirt and some jeans lying at the foot of the bed. Necessary testified that there "appeared to be several different spots upon the pants and some upon the shirt and at that time it was suspected of being blood." He collected the shirt, jeans and socks and placed them into evidence at the Bristol Police Department.

On cross-examination, Lieutenant Necessary testified that he never asked the Defendant if he had killed anyone. He stated that the Defendant had shown no signs of flight or any attempt to escape.

Detective Jerry Smeltzer of the Bristol Police Department testified that Lieutenant Necessary instructed him to respond to the crime scene at Steele's Creek Park where the victim was killed. Upon arriving, Detective Smeltzer interviewed witnesses that led him to locate Brandon Alford. Smeltzer went to the home of Alford's parents, and with the help of Alford's father he located Alford in a trailer park in Sullivan County. He obtained an oral statement from Alford concerning the whereabouts of the Defendant. Alford informed Detective Smeltzer that the Defendant was working at Peerless Woodworking. Smeltzer testified that Christein was also at the trailer with Alford at that time. Smeltzer stated that he and Lieutenant Terry Tester transported Alford and Christein to the Bristol detective office. Smeltzer testified that because Alford had been involved in a previous case of his, he spoke with Alford and questioned him about the events leading up to the victim's death. He further stated that, when he informed Alford of the victim's death, Alford "almost instantly became physically ill and had to go to the bathroom to throw up." Smeltzer said he never took Alford's statement, instead agent Frank McCauley of the Tennessee Bureau Investigation ("TBI") took the statement. Detective Smeltzer further testified that he began interviewing Christein, but had to stop in order to interview the Defendant.

Smeltzer testified that, before he took a written statement from the Defendant, he obtained the Defendant's oral statement. He stated that the Defendant "appeared . . . a little anxious, but for the most part, relaxed and understood everything that was going on and all of [Smeltzer's] questions." After receiving the entire story from the Defendant, Smeltzer then wrote out the Defendant's statement and had the Defendant to verify and sign the statement in the presence of Lieutenant Necessary. Smeltzer further testified that, during his interview with the Defendant, he observed scratches on the Defendant's hands.

6

On cross-examination, Smeltzer testified that he knew that the Defendant and the other men had drank at least two twelve-packs of beer the night before the offense. He explained that he did not give the Defendant a blood test, urine test or breath test, because he did not see or interview the Defendant until several hours later the next day. Smeltzer also explained that, at the time he was talking to the Defendant, the Defendant appeared normal. He further testified that he never asked the Defendant if the victim actually struck him or hurt him in any way, before the Defendant stabbed the victim. He also testified that he never asked the Defendant if he feared for his life or feared bodily harm. Smeltzer stated that he "felt like [he] was very clear on what [the Defendant] was saying and meaning when he was saying it, and [he] didn't feel the need to ask those kinds of questions." Smeltzer also stated that it was not his practice to write down the questions he asked a suspect or to write down answers to questions during the interview. He told the jury that it had been his experience that suspects in homicide cases become nervous when an officer writes while questioning the suspect. He also stated that it was not his practice to video tape or record statements. Smeltzer testified that, because of his methods, he had the Defendant sit beside him and go over the written statement as he wrote it down.

Detective Smeltzer also acknowledged that the Defendant had stated that his only interest in going to the Steele Creek Park was to get the marijuana Christein said was buried in the park. Smeltzer testified that from his interpretation of the Defendant's statement, it was clear that the Defendant was involved in the plan to rob the victim.

Detective Debbie McCaulie of the Bristol Police Department testified that she was called to assist in the investigation of the death of the victim. She stated that she met with Kim Bolling on April 5, 1999 to retrace the route Ms. Bolling and the victim had taken on the previous night. McCaulie testified that the first location was Big Creek, and that they drove into Big Creek until the road ended. At the end of the road, McCaulie noticed a burned out campfire and Natural Ice beer bottles laying around the campfire area. Next, McCaulie testified that Bolling stopped at a concrete bridge, located about four tenths of a mile away from the first location. At the bridge, McCaulie observed scratches on the bridge, "a tire track that ran directly off of the bridge," a Natural Ice beer bottle, and an empty Natural Ice box. McCaulie testified that as she and Ms. Bolling continued to travel out of the Big Creek area, Bolling stopped at a third location on Lakeview Dock Road where McCaulie found what appeared to be a fresh cigarette butt with the ashes on the end of it. McCaulie told the jury that, on a different day, she also visited these same three locations with Brandon Alford.

Detective McCaulie further testified that, at some point, she, Detective Charlie Thomas, Detective Matt Austin and Jared Christein went to a creek bed located at the end of Broad Street Trailer Park. McCaulie stated that they found a wallet partially covered by the dirt and gravel. The wallet contained some cards, but no money was found in the wallet. A driver's license, later identified as that of the victim, was found separate from the wallet submerged in the creek bank and water. McCaulie testified that she retrieved the wallet and its contents and had it placed into custody. She also testified that, when she met the Defendant at the police station, she observed "some scratches on the upper portions of his hands," which she photographed.

The State recalled Detective Thomas, who testified that he examined the Toyota Celica driven by the victim and Ms. Bolling, and found a six pack of bottled Busch beer, a large stick, air freshener, a mountain dew bottle, Natural Ice bottle caps and a pack of Marlboro cigarettes. Thomas stated that he compared the beer bottles from the car with two beer bottles found Steele Creek's Park, and determined that they were the same brand and size. DetectiveThomas also testified that he received two tubes of the victim's blood from Dr. Gretel Harlan, who performed the autopsy on the victim. Thomas stated that he gave these tubes to Lieutenant Trigg McNew, the evidence custodian for the Bristol Police Department.

Lieutenant McNew testified that, as the evidence room custodian, his job was to assist the Criminal Investigation Division with the securing of evidence retrieved from a crime scene. McNew explained that he was also responsible for sending items of evidence, which need testing, to the laboratory for testing. He testified that, on April 6, 1999, he received two vials of the victim's blood from Detective Thomas. On July 2, 1999, McNew transported the tubes of blood to the TBI crime lab in Nashville, and received a TBI laboratory number for the tubes.

Michael Turbeville, a forensic scientist with the TBI crime laboratory in Nashville, testified that he examined a pair of pants and a shirt identified as belonging to the Defendant. He stated that he tested the shirt for the presence of blood and determined that there was human blood on the shirt. Turbeville also tested Defendant's knife for human blood and determined that there was blood on the knife. He then conducted a DNA comparison of the blood on the knife and the shirt with the vial of the victim's blood delivered to the lab by Lieutenant McNew. Agent Turbeville concluded that the blood on the shirt and the knife was that of the victim.

Dr. Gretel Harlan, the forensic pathologist at East Tennessee State University, testified that she was called to Steele's Creek to perform a preliminary examination on the victim's body. Later, Dr. Harlan conducted an autopsy of the victim's body and found that the victim suffered seven "actual stab type wounds, and there were several others that were just scrapes that looked like superficial little sharp edge wounds." Dr. Harlan opined that none of the wounds would have been immediately fatal, "unless they had gotten badly infected," except for a large V-shaped wound to the victim's left lower neck and back. She stated that this V-shaped or "double-thrusting" wound cut an artery, and "would have led to the victim's death within a matter of minutes." Dr. Harlan testified that only two of the stab wounds were more than an inch deep -- the stab to the right buttock and the left lower neck. She further testified that the stab wounds were consistent with the knife possessed by the Defendant. As for the victim's hands, Dr. Harlan testified that

> The thumb on this [sic] left hand was in tact [sic], but the fingers next to it had been largely amputated, so that that much of them were gone. There was a little stump of the little finger and very minimal stumps of the other fingers left. So basically, his left hand was palm, little tiny stubs and a thumb.

*     *     *

8

There was blood on both hands which you would expect from someone still capable of responding with their hands, but on the back of his right hand, multiple knuckles had bruising.

She explained that the bruises on the back of the victim's hands were "consistent with hitting any fairly solid object." Dr. Harlan also told the jury that the victim's blood alcohol level was .23% and that the victim tested positive for marijuana.

On cross-examination, Dr. Harlan testified that a person with the victim's blood alcohol level "would more readily act on his own inclinations." She explained that, if the victim were in a bad mood, he would more likely act on his hostility and become engaged in a fight. She further opined that

Even if he [the victim] were normally not somebody that would get in a fight, if you add a point two three (.23) blood alcohol, he'd be much more apt to land blows or, you know, be verbally abusive and try to get into an argument. And the unfortunate ---- that's the positive side of, you know, being in the fight. The negative side of being in the fight is that he's not as coordinated. So, even though he's more apt to fight, he wouldn't necessarily be a good fighter.

She also stated that it was very possible that the victim did not realize the extent of his injuries due to the alcohol.

Dr. Harlan further noted that none of the wounds suffered by the victim were defensive wounds. She testified that none of the wounds indicated that the victim was blocking the knife or trying to protect himself, because the victim had no cuts on his hands or arms. She explained that the bruises on the victim's knuckles could be consistent with hitting the windshield of a car or hitting a person's face. She also testified that the fatal double-thrust wound could have been made more severe either by the movement of the victim or the person with the knife. On redirect, Dr. Harlan stated that this mortal wound was caused by the full extent of the knife being placed in the victim. She acknowledged that, if the bruising on the victim's knuckles were from hitting someone in the face, then the person hit should also show signs of being hit. However, she also noted that the victim's blood alcohol level might have altered his clotting factors, which would cause him to bruise more easily than other people.

The State rested its case-in-chief.

The Defendant testified that he routinely carried a knife, because his work as a woodworker required him to use a knife. He stated that he did not know Alford and Christein very well, before the day of this incident. Defendant explained that Alford was an acquaintance, who had helped him locate some marijuana on the morning of the incident, and that he had not known or met Christein before that day.

9

The Defendant stated that, during the ride from Big Creek, the victim (who was intoxicated) and Christein argued. He testified that the victim and Bolling helped them smoke the remainder of the marijuana he had bought earlier, and that as he drove he began talking about getting more marijuana. At this point, Christein said that he could get some marijuana at Steele's Creek Park. The Defendant testified that he assumed Christein was planning to purchase the marijuana from a dealer who lived near Steele's Creek Park, as Defendant had bought some marijuana from there earlier that day. Defendant stated that he agreed to buy some gas for the victim Bolling, who had agreed to go to the park. Defendant gave the victim ten dollars for gas, but the victim bought beer instead of gas. The Defendant said that, while they were at the store, Christein asked Bolling how much money the victim had, but Defendant testified he did not think anything of the question.

When they arrived at the park, Christein asked the Defendant and the victim to follow him, as they walked through the path. Defendant testified the he "was kind of wondering what was going on. . ., because [he] didn't know Mr. Christein before this day and [he] didn't know either one of them, but [he] just went on with it. . . ." The Defendant stated that he and the victim were walking close to one another, when the victim began talking in an angry manner, and hit him in the face with a beer bottle, causing his nose to bleed. The Defendant and the victim engaged in a fist fight. The Defendant testified that he tried to run from the victim, but the victim caught him from behind, and continued to hit him until he was down on his hands and knees. At that point, Defendant said that he remembered that he had his knife, and he grabbed it and stabbed the victim, in order to "get the guy off of [him]". Defendant testified that the victim stopped hitting him, allowing him to get up and run away from the victim. The Defendant explained

> And he keeps catching up with me periodically through the whole event. And I really don't know where I stabbed him then or how I stabbed him. He just kept coming up behind me. I just kept slinging back at him and we wrestled all through the event. Then there is one more time. At the very end he kind of got me down again and I believe I stabbed backwards. I believe that's when I stabbed him in the hip. I was kind of down again. Kind of stabbed backwards with my knife. He's standing up and I'm kind of down and that's when we kind of get separated. . . . Well, at first I noticed blood. His shirt had blood all over it. And he wasn't really holding himself, really. Kind of ---- he had his hands up but he wasn't really grabbing at nothing. He wasn't really making no kind of noises or anything, hollering. . . . but he kind of fell down on one knee and fell over on his elbow and I'm standing there watching this whole event. And he's kind of over on his back and then puts his knees up in the air and he's kind of feeling himself.

The Defendant testified that, at this point, Christein began feeling the victim's pockets and turned the victim over "like he's a sack of potatoes and takes his wallet out," while the victim was still moving. Defendant stated that he began to walk out of the park with the knife in his hand, "trying to figure out what [he] should do or why all of this [was] going on." The Defendant said that his nose continued to bleed as he walked. He saw Christein, out of the corner of his eye, roll the

10

victim towards the lake. The Defendant testified that, as he walked out of the park, Christein caught up with him and began "shooting off at the mouth about certain things. . . ."

The Defendant further testified that he had not planned, with Christein, to rob the victim. He insisted that he had been in fear for his life during this altercation. He stated that he thought the victim was still alive and was going to come after him. He said he did not know that the victim had died until the police told him later that day. He asserted that the only reason he had gone to the park was to get marijuana.

On cross-examination, the Defendant admitted that he had lied to the detectives about not being in Steele's Creek Park and about the clothes he was wearing the night of the incident. He further acknowledged that he felt Christein's statement about the marijuana in the park was a lie, but stated that he was not certain there was no marijuana nearby. The Defendant conceded that there was no blood on the back of the shirt he had worn on the night of the stabbing. He testified that he did not mention the victim hitting him with the beer bottle, because Detective Smeltzer did not ask about it.

Bobby Lee Lingerfelt testified that he had know the Defendant all of his life, and that Defendant had a good reputation and was not a violent person.

## ANALYSIS

## I. LESSER-INCLUDED OFFENSES

In his first issue, the Defendant argues that the trial court erred in failing to charge the jury on facilitation to commit especially aggravated robbery, facilitation to commit felony murder, and on second degree murder and voluntary manslaughter as lesser-included offenses of felony murder. The Defendant contends that there was legally sufficient evidence presented at trial, which would have justified a charge on any of the previously mentioned lesser-included offenses. However, the Defendant failed to raise this issue in his motion for new trial. Generally, this Court will not consider issues that are not raised in the motion for new trial. See Tenn. R. App. P. 3. However, under plain error, an error affecting "the substantial rights of an accused may be noticed at any time . . . where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). Upon review, we find there is plain error in this case.

Tennessee Code Annotated section 40-18-110(a) (1997) provides that a trial court must charge the jury with all lesser-included offenses included in the indictment, without any request on the part of the defendant to do so. Under this provision, " a trial court must instruct the jury on all lesser-included offenses if the evidence at trial is legally sufficient to support a conviction for the lesser offense." State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999) (quoting State v. Langford, 994 S.W.2d 126, 128 (Tenn. 1999)).

11

In this case, the Defendant was indicted for first degree premeditated murder (Count I), felony murder in perpetration of a robbery (Count II), and especially aggravated robbery (Count III). As to the first degree premeditated murder count of the indictment, the trial court charged the jury on the lesser-included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. The trial court then instructed the jury on the second count of the indictment charging felony murder, and the third count charging especially aggravated robbery. However, the trial court did not charge the jury on any lesser-included offenses for felony murder. In regards to the robbery of the victim, the trial court charged the jury on especially aggravated robbery, aggravated robbery, robbery and theft under $500. The jury convicted the Defendant of second degree murder on the first count, felony murder on the second count and especially aggravated robbery on the third count. The trial court merged the conviction for second degree murder with the conviction for felony murder.

## A. Facilitation of Especially Aggravated Robbery

The Defendant contends that the trial court erred by failing to instruct the jury on the lesser-included offense of facilitation of especially aggravated robbery. See Tenn. Code Ann. § 39-11-403(a). He argues that the proof presented could have supported a finding that he knowingly furnished substantial assistance in the robbery of the victim, but lacked the intent to rob the victim. The state argues that an instruction on facilitation was unwarranted because the evidence showed that the Defendant and Christein intended to attack and rob the victim.

Especially aggravated robbery is defined in Tennessee Code Annotated section 39-13-403 as "robbery as defined in Section 39-13-401: (1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury." Robbery is defined in Tennessee Code Annotated section 39-13-401 as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tennessee Code Annotated section 39-14-103 provides that "(a) person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." In addition, "[a] person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, . . . the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (1997).

Our supreme court has held that "virtually every time one is charged with a felony by way of criminal responsibility for the conduct of another, facilitation of the felony would be a lesser-included offense." See State v. Fowler, 23 S.W.3d 285, 288 (Tenn. 2000); Burns, 6 S.W.3d at 470. The Defendant was charged and tried under the theory of criminal responsibility for the conduct of his co-defendant, and we therefore hold that facilitation of especially aggravated robbery is a lesser-included offense of especially aggravated robbery, in this case, under part (c) of the Burns test. Burns, 6 S.W3d at 466-67.

Next, we examine whether the evidence presented at trial justified a jury instruction on facilitation of especially aggravated robbery. Id. at 469. This inquiry has two parts. First, we must

determine "whether any evidence exists that reasonable minds could accept as to the lesser-included offense." Id. In making this determination, we must view the evidence "in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence." Id. Secondly, this Court "must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense." Id. If this Court finds there is error, we must determine whether the erroneous failure to instruct on the lesser-included offense was harmless beyond a reasonable doubt. Id.

Reviewing the evidence in light most favorable to the existence of facilitation of especially aggravated robbery without making any judgments on the credibility of the evidence, we note that the Defendant testified that, while he knew Christein intended to rob the victim, he never had such an intent. The Defendant admitted to purchasing the gas that made it possible for the victim and Ms. Bolling to drive Defendant and Christein to Steele Creek Park. However, in the statement Defendant provided to Detective Smeltzer, the Defendant stated that his only purpose in going to Steele Creek Park was to get the marijuana Christein said he had hidden in the park. The Defendant testified that he did not take any of the money that Christein took from the victim's wallet. The Defendant also testified that he stabbed the victim in an attempt to get the victim off of him. We hold that a jury could accept this evidence and find that the Defendant did not have the intent to rob the victim, but knowingly furnished substantial assistance in the commission of the robbery. Therefore, the trial court erred by not charging facilitation of especially aggravated robbery.

We further find that the failure to charge facilitation of especially aggravated robbery was not harmless beyond a reasonable doubt. See State v. Curtis J. Ely, ___ S.W.3d ___ (Tenn. 2001), No. E1998-00099-SC-R11-CD, 2001 WL 605097, at *14, (June 5, 2001)(". . .when determining whether an erroneous failure to instruct on a lesser-included offense requires reversal, we hold that the proper inquiry for an appellate court is whether the error is harmless beyond a reasonable doubt."). Here, the trial court instructed the jury on especially aggravated robbery, aggravated robbery, robbery and theft under $500. The Tennessee Supreme Court has held that a jury's decision to convict the Defendant of the highest offense charged is a necessary rejection of all lesser-included offenses of that higher offense. See id., at *20 (citing State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998)).

However, we conclude that facilitation of a crime involves an entirely different analysis. Facilitation addresses the Defendant's role as a facilitator, rather than a principal actor. The Defendant's theory was that he did not share Christein's intent to rob the victim, but that he provided assistance to Christein by purchasing the gas for them to get to Steele's Creek Park. The intervening lesser offenses charged by the trial court addressed the theory that Defendant acted as a principal. The jury was not permitted to give consideration to a legally sufficient theory of liability proffered by the Defendant (i.e., facilitation); therefore, we are unable to find the error to charge facilitation was harmless beyond a reasonable doubt. We, therefore, reverse Defendant's conviction for especially aggravated robbery in Count III, and remand for a new trial on especially aggravated robbery.

13

**B. Lesser-Included Offenses Of Felony Murder**

The Defendant also contends that the trial court erred in not charging the jury on facilitation of first degree felony murder, second degree murder, and voluntary manslaughter as lesser-included offenses of felony murder. The State argues that there are no lesser-included offenses of felony murder. However, our supreme court's recent opinion in State v. Curtis J. Ely, supra, which was filed after the filing of this appeal, held that there are lesser-included offenses of felony murder.

In Ely, the Tennessee Supreme Court held that facilitation of felony murder is a lesser-included offense of felony murder, under part (c) of the Burns test. Ely, 2001 WL 605097, at *7; Burns, 6 S.W.3d 453 at 466-67. To prove a defendant guilty of facilitation of felony murder, the state must show that the defendant knew his co-defendant was planning to commit the underlying felony, and the person knowingly furnished substantial assistance in the commission of that felony. See State v. Lewis, 919 S.W.2d 62, 68 (Tenn. Crim. App. 1995) (concluding that when a defendant "is charged with a felony by way of criminal responsibility for the conduct of another, facilitation of the felony would be a lesser included offense"), *overruled on other grounds* by Williams, 977 S.W.2d at 106 n. 7. Additionally, we find that evidence does exist that reasonable minds could accept as to the lesser-included offense of facilitation and the evidence is legally sufficient to support a conviction for the lesser-included offense of facilitation of felony first degree murder. The jury could well have concluded that the Defendant lacked the intent to rob the victim, but that he provided substantial assistance to Christein. Thus, it was error not to charge facilitation of felony murder.

We also find that the failure to charge facilitation of felony murder was not harmless beyond a reasonable doubt. As we have previously stated, facilitation poses a different theory of liability (i.e., the role of the Defendant as the facilitator of criminal activity, and not the principal actor). Therefore, the failure of the trial court to present the jury with this option cannot be deemed harmless beyond a reasonable doubt.

Next, we must determine whether second degree murder and voluntary manslaughter should have been charged as lesser-included offenses. In State v. Ely, our supreme court held that second degree murder is a lesser-included offense of felony murder under part (b)(1) of the Burns test, which states that, an offense is a lesser-included offense if the lesser offense fails part (a) only "in the respect that it contains a statutory element or elements establishing . . . a different mental state indicating a lesser kind of culpability." 2001 WL 605097, at *8; Burns, 6 S.W.3d at 466. The Court did not address whether voluntary manslaughter is a lesser included offense of felony murder; however, we find that it is.

Voluntary manslaughter "is the *intentional* or *knowing* killing of another in a state of a passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." See Tenn. Code Ann. § 39-13-211(a) (1997) (emphasis added). The culpable mental state for voluntary manslaughter is "intentional" or "knowing, while the mental state required for first degree felony murder is "intentional." The mental state of 'intentional' is the highest level

14

of culpability, which subsumes all other mental states. The differing mental state of "knowing," clearly indicates a lesser kind of culpability than required for felony murder. Moreover, our supreme court has held "that the 'passion' language in the definition of voluntary manslaughter simply reflects a less culpable mental state than required for first or second degree murder." See State v. Dominy, 6 S.W.3d 472, 479 n.9 (Tenn. 1999). Therefore, voluntary manslaughter is also a lesser-included offense under part (b)(1) of Burns.

We must next determine whether the trial court should have instructed the jury on either of these offenses. Regarding second degree murder, we find that the proof suggested evidence that reasonable minds could accept as to this lesser offense, which is also evident from the jury convicting the Defendant of second degree murder under Count I of the indictment. The Defendant testified that the victim began to attack him, and in an effort to prevent the victim from hitting him, the Defendant began stabbing the victim. Dr. Harlan testified that none of the wounds received by the victim appeared to be defensive wounds, or wounds received in the course of protecting oneself from an attack. Viewed in this manner, we find that this evidence would be sufficient to show that the Defendant was aware that his conduct was reasonably certain to cause the victim's death. See Tenn. Code Ann. § 39-11-302 (1997). We further conclude that these facts were also sufficient evidence of provocation, justifying an instruction on voluntary manslaughter as a lesser-included offense of felony murder.

Finally, we must analyze whether the failure to charge second degree murder and voluntary manslaughter was harmless beyond a reasonable doubt. Concerning second degree murder, we find that the trial court committed reversible error. As was the case in Ely, the jury in this case was not given the option to find the Defendant guilty of a lesser offense than felony murder in Count II of the indictment. Ely, 2001 WL 605097, at * 14. With regard to the first count of the indictment charging the Defendant with first degree premeditated murder, the jury determined that the defendant was guilty of the lesser offense of second degree murder. Although Tennessee does not require consistency in the verdicts of a multiple count indictment, State v. Gennoe, 851 S.W.2d 833, 836 (Tenn. Crim. App. 1992), we cannot conclude that had the jury also been instructed on any of the lesser-included offenses of felony murder, it would have still chosen to convict the Defendant of the higher offense to the exclusion of the lesser offenses. Thus, we find that the trial court's failure to instruct the jury on second degree murder was not harmless error, and therefore reverse Defendant's conviction for felony murder and remand for a new trial.

It was error for the trial judge to not charge voluntary manslaughter. Under the circumstances of this case, any conviction under Count II (the felony murder count) must be merged with the conviction for second degree murder in Count I, which we affirm and remand for sentencing. Accordingly, even if the trial court had charged voluntary manslaughter as a lesser-included of the felony murder count, and the jury had found Defendant guilty of voluntary manslaughter under that count, it would have merged with the second degree murder conviction. Therefore, under the particular facts of this case, the error in not charging voluntary manslaughter is harmless beyond a reasonable doubt. However, our affirmance of the conviction for second degree murder in Count

I is subject to possible further appellate review. If the Defendant is retried for felony murder, and the proof again requires the charging of voluntary manslaughter as a lesser-included offense, the trial court should so charge the jury.

## II. NATURAL AND PROBABLE CONSEQUENCES RULE

The Defendant asserts that the trial court erred in not instructing the jury on the "natural and probable consequences" rule. Specifically, Defendant argues that, because the State pursued a theory of criminal responsibility for the especially aggravated robbery charge, the trial court should have given an instruction on the "natural and probable consequences" rule. The Defendant relies upon the holding in State v. Howard, 30 S.W.3d 271, 277 (Tenn. 2000) (finding that the natural and probable consequences rule is an "an essential element that the State must prove beyond a reasonable doubt," when relying upon a theory of criminal responsibility). The State contends that the natural and probable consequences rule is not applicable, or in the alternative, that the Defendant has waived this argument for failure to submit a contemporaneous objection to the jury instructions.

The "natural and probable consequences" rule underlies the doctrine of criminal responsibility and is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion. State v. Carson, 950 S.W.2d 951, 954-55 (Tenn. 1997). The rule extends criminal liability to the crime intended by a defendant, and also to other crimes committed by a co-defendant that were the natural and probable consequences of the commission of the original crime. See id., at 954-55. In order for the State to impose criminal liability based on the natural and probable consequences rule, the State must prove beyond a reasonable doubt and the jury must find: (1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible under Tenn. Code Ann. § 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime. Id.

We find that the trial court did not err in failing to instruct the jury on the natural and probable consequences rule, as the rule was not applicable to this case. In the case at bar, the target crime was the robbery of the victim and no collateral crimes were committed by the Defendant's confederate, Jared Christein. Thus, the especially aggravated robbery was not the natural and probable consequence of some other crime.

In order for the rule to apply in the present case, the Defendant would have to have shown that the murder was the target crime, and that the robbery was the natural and probable consequence of the murder. Then, this would require the state to prove all the elements of the murder, the Defendant's criminal responsibility for the robbery and that the robbery was the natural and probable consequence of the murder. However, the facts of this case were not presented in this manner and we find no error by the trial court's declining to charge the natural and probable consequences rule. The Defendant is not entitled to relief on this issue.

## III. SUFFICIENCY OF THE EVIDENCE

The Defendant also contends that evidence at trial was insufficient to convict him of first degree felony murder and especially aggravated robbery. We disagree.

When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Keough, 18 S.W.3d 175, 180-81 (Tenn. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). We afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Keough, 18 S.W.3d at 181 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). Questions regarding the credibility of the witnesses; the weight to be given the evidence; and any factual issues raised by the evidence are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

To convict the Defendant of first degree felony murder, the State was required to prove that the Defendant killed the victim in the perpetration of a felony, which in this case was robbery. See Tenn. Code Ann. § 39-13-202(a)(2). The intent to commit the underlying felony must exist prior to or concurrent with the killing in order for a defendant to be convicted of felony murder. See State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999). Additionally, especially aggravated robbery is "robbery as defined in Section 39-13-401: (1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury." See Tenn. Code Ann. § 39-13-401.

The Defendant asserts that there was insufficient evidence to prove beyond a reasonable doubt that he had a prior intent to rob the victim. He argues that it is not reasonable to infer that he agreed to rob the victim, when he had known Christein less than twenty-four hours and had offered to purchase gas for the victim, who had little money.

Taken in light most favorable to the State, the evidence showed that Brandon Alford heard the Defendant and Christein talking about attacking and robbing the victim, while they were riding in the car with the victim and Ms. Bolling. The Defendant testified that he knew of Christein's intent to rob the victim. The Defendant admitted to stabbing and killing the victim. Afterwards, Christein turned the victim over and took his wallet. Later, the Defendant helped Christein dispose of the victim's wallet. From the evidence presented, we conclude that a rational juror could have found beyond a reasonable doubt that the Defendant killed the victim during the perpetration of a robbery. This evidence is also sufficient to sustain Defendant's conviction for especially aggravated robbery. Furthermore, we note that it is not the role of this Court to weigh the credibility of witnesses, rather that function belongs to the jury. State v. Cribbs, 967 S.W.2d 773, 793 (Tenn. 1998). We find that the evidence was legally sufficient to support the Defendant's convictions for first degree felony murder and especially aggravated robbery, although these convictions must be reversed due to the trial court's failure to allow the jury to consider the options of certain lesser-included offenses as discussed above.

17

# IV. SENTENCING

The Defendant also challenges the trial court's order requiring him to serve his twenty-three-year especially aggravated robbery sentence consecutively to his life sentence for felony murder. Although we have reversed Defendant's convictions and remanded for a new trial, we choose to address the sentencing issue in the event of further appellate review or for guidance on remand, in the event Defendant is convicted following his second trial.

The Defendant contends that the trial court erred in finding him to be a dangerous offender and, consequently, imposing consecutive sentences. He argues that the sentence is excessive and effectively nullifies any possibility of parole eligibility for the life sentence. The Defendant also asserts that the sentence is excessive, because by the time he is eligible for parole, he will be over 70 years old and too old to pose a danger to the public.

When a defendant appeals the manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appealing party. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169.

Tennessee Code Annotated § 40-35-115(b)(4) provides that a trial court may order sentences to run consecutively if the court finds that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." However, consecutive sentencing may not be imposed on a dangerous offender, "unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v.. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). The trial court is required to state on the record its specific findings of fact behind, which support consecutive sentencing. See Tenn. Code Ann. § 40-35-209(c); Ashby, 823 S.W.2d at 169.

Here, the trial court found that the Wilkerson factors existed and that the Defendant qualified as a dangerous offender. The trial court also stated its findings on the record. The trial court further found that the the Defendant had an extensive criminal history (Tenn. Code Ann. § 40-35-115(b)(2)), and that the Defendant was on probation at the time he committed these offenses (§ 40-35-115(b)(6)). Either of these additional factors is sufficient to support the consecutive sentence imposed. The record indicated that the Defendant had an extensive criminal background involving the possession of drugs, felony evading arrest, felony criminal mischief, felony reckless endangerment and other charges. Furthermore, at the time Defendant committed these offenses, he

was on probation for prior convictions in three different jurisdictions. Therefore, the record supports the imposition of consecutive sentences.

## CONCLUSION

For the foregoing reasons, we conclude that it was reversible error for the trial court not to charge the jury on facilitation of felony murder, second degree murder and voluntary manslaughter on the  felony murder count.  We also find that it was reversible error not to charge facilitation of especially aggravated robbery as a lesser-included offense of especially aggravated robbery under Count III.  We reverse the Defendant's felony murder and especially aggravated robbery convictions, and remand the case for a new trial on both counts.  The Defendant's conviction for second degree murder, which the trial court originally merged into the felony murder conviction, is hereby reinstated and remanded for sentencing.  Following retrial of the felony murder count, the trial court is instructed to merge any resulting conviction of felony murder or of a lesser included offense with the Defendant's second degree murder conviction.

_____
THOMAS T. WOODALL, JUDGE